# SUPREME COURT OF TEXAS,

## TYLER, 1857.

T. J. Haldeman and Others v. T. J. Chambers and Another.*

All the stipulations which go to constitute the entire substance of the contract between the parties, are to be taken, considered and construed together, so that every part may be interpreted by the whole. And the writing is to be read by the light of surrounding circumstances, in order more perfectly to understand the extent and meaning of the parties.

Where an agent in whose possession was a certificate of public debt of the late Republic, without authority from his principals, negotiated a sale of the certificate for a tract of land, and covenanted that he had full authority to assign said certificate ; and the assignee gave to the agent a bond to convey the land, reciting the consideration thereof to be said assignment and covenant, and the engagement of said agent to cause the said certificate (which had been sent to New York) to be delivered to him within sixty days, and the full amount of any loan which might have been negotiated thereon ; and it was proved that the object of the assignee, in said transaction, was to convert said certificate immediately to the payment of his debts which were pressing him ; it was held that the proper construction of the

* This case was decided at Austin, 1856, and the application for re-hearing at Galveston, 1857.—REPS.

Vol. XIX.                    1

whole contract was, that the assignment of the certificate should be perfected and the certificate delivered within the sixty days.

The contract speaks for itself, and there is no mistaking its meaning. And although we may not look to evidence outside of it, to ascertain the meaning of the language employed, or to interpret the writing ; yet we may do so to see if our construction of the contract accords with what is shown to have been the actual understanding of the parties, as shown by other evidence admitted without objection and by consent ; and we find that it does.

Where an agent made a contract for the purchase of real estate, for which he executed an assignment of an audited certificate of public debt, the property of his principal, representing and covenanting that he had full authority so to act, it was held that the assignee (and vendor,) might claim a rescission of the contract, either instantly upon the discovery of the want of authority of the agent ; or he might give time to the principal to make good the contract of the agent, by completing the assignment which the latter had assumed to make without authority ; and in case of his failure to do so, then to claim a rescission of the contract ; and that his right to claim such rescission could not be defeated by the mere ratification of the act of the agent by the principal, without perfecting the assignment, so as to enable the assignee to enjoy the ownership of the certificate.

An innocent misrepresentation of a material fact, entitles the other contracting party to a rescission, the same as if the misrepresentation were fraudulent ; for it operates as a surprise and imposition upon him.

Where the consideration of a bond for title to land was a certificate of public debt which was in the hands of a third person, and to which the vendee gave the vendor a defective assignment, contracting to perfect it within sixty days, and the vendee failing to perfect the assignment within the time prescribed, or within the space of nearly a year, the vendor declared his election to rescind the sale, and the vendee thereupon notified the person in whose hands the certificate of public debt was, not to deliver it to the vendor, until the dispute was settled, and immediately brought suit for a specific performance of the bond for title ; it was held that if the vendee elected to go for the land, he must have given up the certificate.

The Court is not bound to receive the submission of a case without a jury, where the assessment of unliquidated and uncertain damages is involved ; but if the Court sees proper to receive the submission, it will assess the damages.

Where a party voluntarily rescinds a contract, he cannot afterwards sustain a claim for damages for a previous breach of it.

It is very questionable whether an action will lie in any case, for the injury done the plaintiff by slandering, and bringing into doubt and distrust, his title, by one who claims title in himself, and brings suit for the recovery of the property ; at all events this is not such a case.

Haldeman v. Chambers.

Appeal from Bastrop. Tried below before the Hon. Thomas H. DuVal.

Suit commenced July 25th, 1854, by Thomas J. Haldeman, John R. Birch and his wife, Mary Rirch, formerly Mary Haldeman, of Cincinnati, Ohio, and John A. Haldeman, of Illinois, against Thomas J. Chambers, of Liberty county, and David Haldeman, of Bastrop. The petition alleged that Jesse Haldeman, late of said county of Bastrop, was the owner, in his life time, of a claim against the late Republic, for $13,300, at the scaled rate, evidenced by an audited certificate issued to said Jesse, October 18th, 1849 ; that said Jesse died in July, 1850, leaving a will, in which he bequeathed said claim to the plaintiffs and defendant David Haldeman, and Elizabeth Ann McAtee, formerly Elizabeth Ann Haldeman ; will probated August Term, 1850, and letters testamentary issued ; that in March, 1852, in pursuance of an order of Court, of November Term, 1851, said executor delivered said certificate to said defendant David Haldeman, for himself, and as attorney in fact for the other legatees ; that on the 4th of March, 1853, said David, acting for himself and as attorney in fact of his said co-legatees, sold, assigned and conveyed said certificate to defendant Chambers, and that on the next day, Chambers, in consideration of said assignment, and the engagement of the said David Haldeman to cause said certificate to be delivered to him within sixty days, executed and delivered unto said David Haldeman his bond for title, dated by mistake March 5th, 1851, a copy of which is hereto appended and prayed to be taken as part of this petition, by which said Chambers bound himself to convey to said David Haldeman a tract of land described in said bond as follows : (here followed description of the land in Bastrop county, containing 1112 2-10 acres ;) that the said certificate was delivered to defendant Chambers within the sixty days ; that on the 12th of July, 1853, defendant David Haldeman, for the consideration of $3,905, to him paid by plaintiff, Thomas J.

Haldeman, for himself and the rest of the legatees, except the said David Haldeman, and for the further consideration mentioned in said deed, sold and conveyed to said T. J. Haldeman all his right, title and interest to said tract of land, and said bond for title, so far as said bond bound said Chambers to make title to said David, and authorized said Chambers to make title to said Thomas J. Haldeman, according to the tenor and effect of said bond ; that plaintiffs notified Chambers of said sale of said land, and assignment of said bond, and requested him to make title, &c. ; that he failed and refused, &c. ; that after such notification and request, to-wit : on or about February 18th, 1854, Chambers and David Haldeman combined for the purpose of defrauding plaintiffs in the premises, and executed jointly a deed of revocation, &c., David Haldeman representing himself in said deed of revocation as the attorney in fact of his co-legatees ; whereas he had long before that time ceased to be their attorney or agent ; said deed in possession of defendants, and copy will be given in evidence if original is not produced ; that July 18th, 1854, Chambers entered on the land forcibly and unlawfully, &c. ; allegations and prayer for sequestration ; prayer for specific performance of the bond for title, and for cancellation of the deed of revocation thereof.

The writ of sequestration was issued, and the land was replevied by Chambers.

Answer by defendant Chambers, alleging that his object in selling the land for the audited claim was to raise money to pay just debts that were then pressing him ; that he expressly informed David Haldeman at the time that such was the fact, and that his entire object in making the sale would be defeated if any difficulty should intervene in perfecting the assignment of the claim ; that said David assured him he had ample authority from his co-legatees to make the assignment, and exhibited certain powers of attorney ; but the defendant not being fully satisfied that he had full power, required of him the stip-

ulation to perfect the assignment and deliver the claim to him within sixty days ; that the authority of said David really proved defective ; that his co-legatees denied his authority, and refused to perfect the assignment ; that the assignment was not perfected nor the claim delivered within sixty days nor since ; and that the claim still remains, where it was at the time of the original transaction, in the hands of J. H. Brower of New York, subject to the control of the said David Haldeman, and his co-legatees, the plaintiffs in this suit ; that the revocation of the bond and assignment, by said David and this defendant was not made to defraud the plaintiffs, but was made in consideration of the facts set forth in this answer and in the said act of revocation, which defendant prays may be taken as part of this answer.

This defendant denies that he ever had notice of any transaction between the said David Haldeman and the said Thomas Jefferson Haldeman, in regard to the said claim, and his said bond for a deed for said land, until about or near the time the said revocation was made ; and he alleges that the first notice he received of it was accidental, and that all the information he subsequently acquired upon the subject, was obtained by diligent inquiry and investigation ; and that all the information which he was able to procure upon the subject, led him to the conclusion that said transactions, and especially the said David's assignment to the said Thomas, of this defendant's said bond, were illegal, fraudulent and void ; and this defendant charges that said assignment of said bond was made to defraud this defendant out of his said land, and that he is informed and believes that the other said co-legatees, or some of them, were dissatisfied with, and rejected, and repudiated said transaction ; and that the said revocation was just and proper, because the objects of the original trade had failed,. and the revocation would place the parties back where they stood before the trade was made.

Defendant Chambers also denied that he had forcibly taken.

possession of the land, and alleged that he had never parted with the possession of it; alleged that the allegations of the petition made to obtain the writ of sequestration were false; and detailed at great length the conduct of T. J. Haldeman in the premises, which he alleged was unjust, unconscientious, vexatious and oppressive, to the damage of this defendant $10,000, which he therefore claims.

The answer of David Haldeman alleged same as the answer of Chambers, as to the original transaction and its revocation, and accounted for his assignment to T. J. Haldeman by alleging that when he made said assignment he thought his co-legatees had confirmed his original contract with Chambers.

A jury was waived and the cause submitted to the Judge on the following evidence:

Plaintiffs gave in evidence the bond sued on, as follows:

THE STATE OF TEXAS, *Bastrop County.* Know all men by these presents, that whereas David Haldeman, as one of the legatees of the late Jesse Haldeman, and as agent and attorney in fact of the rest of the legatees of the said Jesse Haldeman, has this day transferred and assigned to me, T. Jefferson Chambers, the claims of the said Jesse Haldeman against the late Republic now State of Texas, amounting to the sum of thirteen thousand and three hundred dollars at the scaled rate, as appears by a certificate of Public Debt, issued to the said Jesse Haldeman at Austin, on the 18th day of October, A. D., 1849, and the said David Haldeman has warranted with a full guaranty the aforesaid assignment; therefore, in consideration of the said assignment and warranty, and the engagement of the said David Haldeman, to cause the said certificate to be delivered to me within sixty days, and the full amount of any loan which may have been negotiated thereon, I, the said T. Jefferson Chambers, do by these presents agree to sell, alien and convey unto the said David Haldeman, the tract of land situated in the said county

of Bastrop, on the western margin of the Colorado river, known as the "Tennell Bend," and comprehending the land lying in front of the bend, between the tracts heretofore sold by me to Nash on the upper part, to Cooke on the lower part, and to the Moore's and Carter in front, at the rate of ten dollars per acre. And whereas the exact amount of said tract of land is not known, it is agreed that the same shall be accurately surveyed, and if the amount is not sufficient to take the full amount of the aforesaid claim, then a sufficient amount for that purpose shall be taken out in the Post Oaks, at two dollars and fifty cents per acre to make it up ; and I, the said T. Jefferson Chambers do hereby bind myself, my heirs and legal representatives to make a good and sufficient general warranty deed for the said land.

In testimony whereof I have hereunto set my hand and seal, this fifth day of March, A. D., one thousand eight hundred and fifty-one in the presence of the undersigned witnesses.

T. J. CHAMBERS, [SEAL.]

P. S.—It is further understood and agreed that if the amount of land contained in the tract of land designated in the above instrument as the Tennell Bend tract, is not sufficient to take the whole amount of the said certificate at ten dollars per acre, then the said David Haldeman shall have the privilege of taking land for the balance or money at my option, when the claim is paid by the Government.

T. J. CHAMBERS, [SEAL.]

Attest :

J. R. SLOCUMB.

C. JOHNSON.

The plaintiffs then gave in evidence the following assignment from David Haldeman to T. J. Haldeman, recorded July 15th, 1853 :

Whereas I, David Haldeman, of the county of Bastrop and State of Texas, did on the 5th day of March, A. D., 1853, purchase for myself and the other heirs and legatees of Jesse

Haldeman, of T. Jefferson Chambers, a certain tract of land
situated in the county of Bastrop aforesaid, on the western
bank of the Colorado river, known as the " Tennell Bend,"
and which is fully described in the bond of said Chambers to
me, executed on the day aforesaid, but bearing date by mis-
take on the 5th day of March, 1851, for and in consideration
of which I, on the day aforesaid, for myself, and as agent and
attorney in fact of the rest of the heirs and legatees of said
Jesse Haldeman, deceased, assigned and transferred the claims
of the said Jesse Haldeman against the late Republic, now
State of Texas, amounting to the sum of thirteen thousand,
three hundred dollars at the scaled rate, the same being an
audited certificate of Public Debt, issued to the said Jesse
Haldeman at Austin, on the 18th day of October, A. D., 1849.
The price agreed upon for said land being ten dollars per
acre, and inasmuch, as the quantity contained in said tract
was not known, it was specified in the bond of said Chambers,
that said land should be surveyed, and the quantity estimated,
and it was further specified that, if a balance of said certificate
should remain, after paying for said land, then said Chambers
should repay the overplus in the manner specified in said
bond.   And said land having since been surveyed by the Sur-
veyor of Bastrop county, and ascertained to contain one thou-
sand one hundred and twelve and two-tenth acres.   Now,
therefore, in consideration of the premises, and for the consid-
eration of three thousand nine hundred and five dollars to me
paid by Thomas. J. Haldeman, of Cincinnati, Ohio, one of the
legatees of the said Jesse Haldeman, deceased, and as attorney
in fact for the rest of the legatees of said Jesse Haldeman,
deceased, I do hereby grant, bargain, sell, assign, transfer and
convey unto the said Thomas J. Haldeman, all the right, title,
interest and claim, both legal and equitable, which I have or
may have in and to the tract of land aforesaid, known as the
" Tennell Bend," and also all right, title, interest and claim I
may have in and to the said title bond of the said T. Jefferson

Chambers, so far as he binds himself to make title to me for said tract of land known as the Tennell Bend, and hereby authorize and direct said Chambers to make said title to said Thomas J. Haldeman, his heirs and assigns. But it is hereby distinctly understood and specified that the overplus of said audited draft, after paying for said tract of land is reserved to me, and is not transferred or assigned by these presents. Given, &c.

The plaintiff then proved that the tract of land contained one thousand one hundred and twelve and two-tenths acres; conveyance from Elizabeth Ann McAtee to Thomas J. Haldeman of her interest in said land, being one-fifth, dated August 10th, 1853; deposition of J. H. Brower, proving that the audited draft was received by him from Reynolds & Gillespie of Bastrop, by letter dated Bastrop, January 5th, 1853, with a power of attorney from David Haldeman to borrow money upon the faith of it; but that no money was borrowed upon it ; that about the second of April, 1853, he received from Chambers a notarial copy, and sometime thereafter the original assignment from David Haldeman to him, as follows:

THE STATE OF TEXAS, *Bastrop County*. Know all men by these presents, that I, David Haldeman, for myself, and as agent and attorney in fact for Thomas Haldeman and Sarah Ann, his wife, by virtue of a power of attorney bearing date the 26th of October. A. D., 1851, or thereabouts ; and for John A. Haldeman and Jane, his wife, by virtue of a power of attorney bearing date the 9th of September, A. D., 1851, or thereabouts ; and for Francis X. McAtee and Elizabeth, his wife, by virtue of a power of attorney bearing date the 10th of August, A. D., 1851 ; and for John R. Birch and Mary, his wife, by virtue of a power of attorney, bearing date the 18th of October, A. D., 1851, or thereabouts, do hereby declare that we are all legatees and the only legatees of the late Jesse Haldeman, deceased, and that by virtue of our rights as such, and of the aforesaid powers of attorney, and of

the order and decree of the Probate Court of the aforesaid county of Bastrop, made at Nov. Term, A. D., 1851, ordering the claims of the said Jesse Haldeman, against the late Republic, now State of Texas, to be delivered up to the said David Haldeman, to be collected or disposed of by him : I, the said David Haldeman, for myself, and as agent and attorney in fact of the above mentioned legatees, for and in consideration of the sum of thirteen thousand three hundred dollars to me in hand paid, the receipt of which is hereby acknowledged, do by these presents sell, transfer, assign and make over to T. Jefferson Chambers, all the claims of said Jesse Haldeman, deceased, against the late Republic, now State of Texas, as contained, set forth and acknowledged in a certificate of public debt issued to the said Jesse Haldeman, at Austin, on the 18th day of October, 1849, or thereabouts, for seven thousand dollars principal, and six thousand three hundred dollars interest, at the scaled rate. And I do hereby transfer and assign the said certificate to the said Chambers, together with all the rights, interests, profits, benefits, advantages, privileges, actions and claims which appertain to the same, or may result therefrom. And I do hereby declare and covenant with the said Chambers, that I have a full and perfect right to transfer and assign the said claims as above. And I hereby bind myself and the above named legatees, to warrant and defend the aforesaid claims unto the said T. Jefferson Chambers, his heirs and assigns, on my own part, and on the part of all the above named legatees of the said Jesse Haldeman, to collect and receive the aforesaid claims of the said Jesse Haldeman from the Government, and to receipt therefor, and to make and execute all such receipts, releases, acts and instruments as may be necessary and proper in the matter ; and all powers heretofore given by me are hereby revoked. And whereas the aforesaid certificate of Public Debt, in behalf of the said Jesse Haldeman, has been sent to J. H. Brower & Co. of the city of New York, together with the aforesaid powers of attorney

from the aforesaid legatees to me, and a power of attorney from me to the said J. H. Brower & Co. to hypothecate the same for a loan of ten thousand dollars or thereabouts ; full authority is hereby given to the said T. Jefferson Chambers to ask, demand and receive the aforesaid certificate and powers of attorney from the said J. H. Brower & Co., or from any other person or persons having the possession of the same ; and also to ask, demand and receive the full amount of any loan which may have been negotiated thereon.

In testimony whereof I have hereunto set my hand and seal for myself, and as agent and attorney in .fact for the aforesaid legatees, this 4th day of March, 1853, in presence of the undersigned witnesses.

DAVID HALDEMAN, [SEAL.]

Attest :

J. R. SLOCOMB.

C. JOHNSON.

In reply to the letter in which Chambers enclosed the notarial copy to Brower, and informed him of his ownership of the certificate, the latter remarked that if he, Chambers, should direct any disposal of the certificate, it would be necessary for him to forward the original transfer. Here Brower's testimony continued as follows :

After I received said instrument of assignment, I did receive instructions from said Chambers, dated Galveston, July 9th, 1853, in which he informed me he had taken the said certificate of public debt in payment for the most valuable piece of property he had, which he had sold to meet the claims against him and that he had thought it advisable to draw drafts in favor of his creditors against that claim in my hands, which he requested me to accept, to be paid out of the proceeds of the sale of that certificate.

And he farther stated that one of the claims was a judgment which was controlled by Mr. S. M. Swenson, of Austin, and that Mr. Swenson had proposed to purchase the claim, for

which he, Chambers, had referred Swenson to me, and in case he did purchase, the said judgment was to be taken as part payment therefor. On or about August 1, 1853, I received a proposition to purchase the aforesaid certificate of public debt, through the instrumentality of said Swenson, from Mr. John Henry, of this city, which I held subject to the approval of the said Chambers, feeling satisfied Henry would still comply, if the advice from Chambers should be favorable, the consideration of which was to be twelve thousand dollars, at six, seven and eight months, from July 30, 1853, with interest from that date at 7 per cent. per annum, and the transfers to remain in my hands until Mr. Henry's notes should be paid ; but upon examination of the powers of attorney, and decree of the Court under which David Haldeman conveyed the said certicate to said Chambers, by the counsel of Mr. Henry, he said there might be a legal question raised as to whether, under that decree and those powers, said David Haldeman had the right to sell the said certificate. The objection upon that question I communicated to said Chambers, in my letters to him of August 1st, 1853, and August 4th, 1853 ; and in that of 1st of Aug. I olso communicated to him the proposal of Mr. Henry to make the purchase as aforesaid provided the title to the said certificate could be made clear and complete.

Under date of Chambersia, Sept. 3, 1853, said Chambers replied to me to my said letters of Aug. 1 and 4th, giving assurance (because he entertained no doubt Mr. David Haldeman would make great exertions to make the transfers complete) that the transfers should be made fully satisfactory to me with as little delay as possible, and authorizing me in my discretion to make the sale to Mr. Henry. Upon receipt of this letter of Sept. 3d, from Chambers, I called on Henry, who I found still ready and willing to make the purchase for $12,000 so soon as the title could be made complete in him, provided nothing should occur in the meantime to lessen the then apparent value of the certificate, and provided he should

be answered affirmatively by or before the 15th Nov. following. I received Chambers' letter of Sept. 3d on 21st, and wrote him on 23d September (two days afterwards) the result of my interview with Henry, as aforesaid, that I considered Mr. Henry's notes good. And at same time the means of a satisfactory conveyance to Mr. Henry not being in my hands, I again stated to Mr. Chambers my preference that he should for himself decide whether the sale should be made—I not having committed him absolutely to it. My next letter from Chambers was of Nov. 1, '53, dated at Anahuac, in which, after stating that mine of 23d Sept. had beed received : after some delay, perhaps from sickness in Galveston, and an attack of yellow fever, from which he had himself suffered severely, and again leaving it to my discretion to consummate the sale to Henry, provided the proceeds of it could be made available to pay his debts, but not otherwise : he stated, "I shall start " in a few days to see Mr. Haldeman in person, to get the " transfers arranged as you suggest, and I shall lose no time in " remitting them to you as soon as they are obtained." This letter I received 15th Nov., and saw Mr. Henry, who was still prepared to consummate the purchase as aforesaid, and that he would write Mr. Swenson (at Austin) that he would carry out such arrangements as he, Chambers, and Swenson might make, upon both Chambers and Swenson giving Henry and myself clear and explicit instructions. On 16th Nov. 1853, I wrote Mr. Chambers, directed to Austin, what I have just stated of the interview with Mr. Henry, but have never, I think, had any answer to that letter. A long time afterwards (I do not see by any of my papers that I can specify the time) Mr. Henry called on me and stated that he felt himself released from every proposition he had made for the purchase of the certificate of public debt : to which I replied that if Mr. Chambers had not arranged with Mr. Swenson, upon my advice to Chambers of Nov. 16th, 1853, before his advice in conformity with his notice to me could reach Mr. Swenson, at Austin, I

considered that he was under no obligation in the premises, and that he had a perfect right to withdraw. I have never been able to negotiate for any other sale of the said certificate, nor for a loan of money upon it. But it could have been sold to Mr. Henry, as I have stated, but for the impediment, which Mr. Henry was advised by counsel, stood in the way of Mr. David Haldeman's power to convey title by sale.

On 19th June, 1854, I received a telegraphic dispatch, dated New Orleans, June 16th, 1854, directed to J. H. Brower & Co., as follows: "Don't give up Haldeman's certificate to Chambers or Haldeman—instructions soon reach. Thos. J. Haldeman." On 30th June, 1854, I received a letter, dated New Orleans, June 16th, 1854, directed to J. H. Brower & Co., New York, as follows:

(This was a letter from Thos. J. Haldeman, informing Brower that the writer had just ascertained that Chambers was attempting to recover back the land, which would be resisted by the heirs, who it was stated, were anxious to recognize the claim of Chambers to the certificate, but not to both; that if Chambers could legally get back the land, he would of course have no interest in the certificate, " and therefore the heirs wish it to be held by you, without further incumbrance or complication, until a settlement can be had with Gen. Chambers respecting the land; and this is your notice to that effect.") Brower stated that he held the certificate subject to the decision in this suit, and that he did not understand that pending this legal controversy, the certificate was under or subject to any conditions, liens or incumbrances, except the legal disabilities which the suit in question, and the defect in the title from David Haldeman to Chambers placed upon it. Chambers' drafts, to be paid out of the proceeds of the sale of the certificate, were not paid; nor did it appear that they had been accepted by Brower. August 4th, 1854, Chambers wrote to Brower, detailing the embarrassments the negotiation for the certificate had met with, stating that the transaction had been

revoked by himself and David Haldeman for himself and co-legatees, and that he, Chambers, had determined to have nothing more to do with the certificate.

The correspondence referred to in Mr. Brower's deposition was annexed thereto, but its substance has been sufficiently stated.

The plaintiffs then proved notice to defendant Chambers to produce a letter from T. J. Haldeman to him, received in December, 1853 ; and said defendant having failed to do so, plaintiff called C. K. Hall, who testified that :

Thomas. J. Haldeman forwarded to him, witness, from Cincinnati, a letter enclosing one to the defendant Chambers, which witness was requested to open and read, and then hand or send to the defendant Chambers, which letter notified the defendant Chambers, of his, T. J. Haldeman's, purchase from David Haldeman and his sister, of their entire interest in and to the tract of land known as the Tennell Bend tract, the land in controversy. Said letter also contained a request to Chambers, how he wished him to execute the deed to the land, viz : to make the deed conveying an interest of three-fifths to T. J. Haldeman. Said letter also contained a statement that David Haldeman had no interest whatever in the land ; there were also copies of powers of attorney from some of the heirs to T. J. Haldeman, or relinquishments, and a relinquishment from T. J. Haldeman to David Haldeman, in the certificate. Capt. T. J. Haldeman requested witness to see Gen, Chambers as soon as I could after receipt of his letter. Witness started to Austin sometime in February, A. D., 1854, for that purpose, and met Gen. Chambers near Walnut creek. Witness stated to him his business, and stating that he had a letter from Capt. T. J. Haldeman, with the papers above alluded to, and notified him that Thomas J. Haldeman had purchased David Haldeman's interest in the land in controversy ; also, of the manner in which Thos. J. Haldeman wished the deed to be made. Witness returned to Bastrop ; in a day or two, after which,

and before the rescission with David Haldeman, Gen. Chambers called to see him and to examine the papers. After looking them all over twice, Gen. Chambers told witness that he would prefer to place the parties all back as they stood, and rescind the whole contract.

The plaintiffs then introduced the deposition of S. M. Swenson, as follows:

The certificate in question was offered to me for sale by John H. Brower of the city of New York, as agent or attorney for Gen. T. J. Chambers, and I agreed with said Brower, on behalf of myself and Mr. John Henry of Liberty street, New York, to buy the said certificate for the sum of twelve thousand dollars, remarking at the time that my said agreement was based upon receiving a valid transfer; of which I stipulated for legal advice and investigation of the transfers accompanying the said certificate. An attorney was agreed upon, and engaged to make the proper investigation of said transfers which he afterwards pronounced insufficient, and furnished his opinion in writing, giving a copy thereof to each, the said Brower and myself (which if I can find I will attach hereto.) The precise defect I cannot state, but I recollect the legal gentleman remarked that Mr. Brower's authority to dispose of Gen. Chambers rights (if any he had,) was perfect, and that the insufficiency in transfer was from the Haldeman family, or some one of them, to Gen. Chambers.

Subsequently Mr. Brower suggested that he would endeavor to procure from the proper parties (through Gen. Chambers,) sufficient transfers, if I would agree to pay for the certificate when such complete transfers were tendered with the certificate; to this I agreed, for self and J. Henry, stipulating that said transfers should be tendered within six months from the time of these negotiations, which took place in New York in the months of July and August, 1853. The tender of complete transfers were never made to me, and I am informed no such tender was made either to Mr. J. Henry, and on the 8th

Haldeman v. Chambers.

day of May, 1854, I notified Gen. Chambers (by letter mailed direct to him at Galveston,) That John Henry had written to me that in consequence of the failure of obtaining proper transfers, he would from that time look upon the transaction as having failed, and being at an end, or words to the same purport.

Thomas J. Haldeman was introduced to me sometime in the summer of 1854 ; he then made inquiries respecting the negotiations had in New York for the purchase of the certificate, full particulars of which I communicated to him. I presume his object in calling on me was to learn the particulars of said negotiation. The conversation was protracted. I do not recollect all he said. I do remember he stated that Gen. Chambers had neglected to obtain the proper transfers to the certificate. That he (Haldeman) had lately notified or enjoined J. H. Brower from making any sale of the certificate. That he would or intended to sue General Chambers for title to a piece of land which should have been conveyed to him or the Haldeman's in lieu of the certificate, etc.

The plaintiffs then read the deposition of M. M. Potter, Esq. as follows :

I know Thomas J. Haldeman and Thomas J. Chambers. Do not know the other parties. Thomas J. Haldeman and Gen. Chambers met at my office in the city of Galveston, during the summer of 1854, either in the month of June or July. I was at that time attorney for Captain Haldeman in relation to the matters in dispute between him and Gen. Chambers. A conversation then took place between Capt. Haldeman and Gen. Chambers, in which I took part as attorney for Haldeman. The object of the conversation was to see if they could make a settlement, and compromise their difficulty without recourse to law. The sale made by David Haldeman to Gen. Chambers of the certificate of public debt of the late Republic of Texas, referred to in the second interrogatory, was talked of. Capt. Haldeman said that he and the heirs of Jesse Halde-

man, other than David Haldeman, had not intended to authorize David Haldeman to sell said certificate, and that he did not and never had supposed that the power of attorney under which his brother David Haldeman acted in making the sale to Gen. Chambers was sufficient to authorize such sale, but that he supposed Gen. Chambers had the power of attorney before him when he made the purchase of the certificate ; which he (Gen. Chambers,) admitted to be so. Capt. Haldeman also stated that after the trade was made between David Haldeman and Gen. Chambers, and so soon as he and the other heirs learned fully about the matter, they immediately took steps to confirm the sale of the certificate made by David Haldeman to Gen. Chambers, and as they intended and believed, had fully affirmed it ; that he was agent for the heirs of Jesse Haldeman, other than said David Haldeman, had settled and compromised the matter in relation to the certificate and other matters with said David, and in such settlement he had taken an assignment from said David Haldeman, of Chambers' bond for title to the land, which Chambers had given to said David for said certificate, and that said assignment was duly recorded in the office of the Clerk of the County Court of Bastrop county, long before said Chambers undertook to rescind or annul said trade about the certificate and land ; and Captain Haldeman wished Gen. Chambers to make a conveyance of the land in accordance with the provisions of the bond and the assignment thereof. He also offered to give said Chambers any other or further transfers or assignments of title to said certificate that he should wish. Gen. Chambers refused to make a conveyance of the land. Said he could have used the certificate when he first traded for it with David Haldeman, had he obtained a perfect title to it, but that he had failed to be able to use it in consequence of the power of attorney under which David Haldeman acted in the sale to him, being insufficient to authorize the sale, and that it was now too late for his purpose ;

said that immediately after he purchased the certificate from David Haldeman, he ordered John H. Brower, of the city of New York, to hold the same for his benefit, and sell it for him —the certificate having been previously forwarded to said Brower by said David Haldeman—and that the certificate still remained in the hands of said Brower ; but also that Brower had been unable to sell the certificate for him, on account of the power of attorney under which David Haldeman acted in the sale to him, being insufficient to authorize the sale.

Defendant Chambers then read in evidence the act of rescission, as follows :

THE STATE OF TEXAS, *Bastrop County.* Know all men by these presents, that whereas David Haldeman, for himself, and as agent and attorney in fact for his brothers and sisters, all being legatees of Jesse Haldeman, deceased, by virtue of power of attorney from his brothers and sisters, and of an order and decree of the Probate Court of the county of Bastrop, made at the November Term, A. D., 1851, ordering the claims of the said Jesse Haldeman against the late Republic now State of Texas, to be delivered up to the said David Haldeman, to be collected and disposed of, did for himself and as agent as above expressed of the other legatees, on or about the 4th day of March, A. D., 1853, sell, assign, transfer and make over to T. Jefferson Chambers, all the claims of the said Jesse Haldeman, deceased, against the late Republic now State of Texas, amounting, at the scaled rate, to thirteen thousand, three hundred dollars, and the said David Haldeman, in making said sale and transfer, did also declare and covenant that he had a full and perfect right to sell and transfer said claim as above mentioned, and did bind himself and his said co-legatees to warrant and forever defend the aforesaid claim unto the said Chambers, his heirs and assigns against all claims or demands whatsoever. And whereas further the said T. Jefferson Chambers, in consideration of

the said sale, transfer and assignment to him of the said claim of the said Jesse Haldeman against the late Republic now State of Texas, amounting to thirteen thousand, three hundred dollars, at the scaled rates, and of the said guarantee and covenant concerning the right, sufficiency and validity of said sale and transfer, did agree to sell, alien and convey unto the said David Haldeman, the tract of land situated in the said county of Bastrop, on the western margin of the Colorado river known as the "Tennell Bend," and comprehending the land lying in front of the bend between the tracts heretofore sold by said Chambers, to Nash on the upper part, to Cook on the lower part, and to the Moore's and Carter in front, at the rate of ten dollars per acre, and to make in favor of the said David Haldeman a good and sufficient warranty deed for the same. And whereas, furthermore, subsequent investigation, and a more critical examination, have shown that the right and powers under which the said David Haldeman acted, were doubtful and insufficient to authorize him to make the said sale, transfer and assignment to the said T. J. Chambers, of the said claims of the said Jesse Haldeman against the late Republic now State of Texas, so that the said Chambers has been wholly unable to collect, sell or use the same; and whereas much complaint, discontent and dissatisfaction has arisen among the said legatees of the said Jesse Haldeman, deceased, growing out of the above mentioned attempt of the said David Haldeman, to sell and transfer the said claims of the said Jesse Haldeman, deceased, to the said T. Jefferson Chambers, for the said tract of land, to be conveyed in consideration thereof to the said David Haldeman, in his own name. And whereas the said T. Jefferson Chambers, and the said David Haldeman are both unwilling to be in any way the cause of unkind feeling amongst brothers and sisters, and believing that the fullest justice may be done to all the parties concerned, by their being placed back in the same situation they were in prior to said attempted sale and transfer

of said claims of the said Jesse Halderman, deceased, and the said agreement of the said Chambers, in consideration thereof, to sell to the said David Haldeman the said tract of land known as the Tennell Bend, and believing also that the true interests of the said legatees of the said Jesse Haldeman, deceased, require that they should retain the ownership of the said claims of the said Jesse Haldeman, deceased, against the late Republic now State of Texas, because the said claims belong to a class of claims designated by the Auditorial Board in its Report to the Legislature as Document C, which they recommend as meritorious claims which ought to be paid at par, because they still remain in the original hands, and the Government had received the full amount of the nominal face of the claims, and one of the said class of claims having been brought before the Legislature which ordered it to be repaid at its full nominal amount. It is believed that all the claims belonging to that class, *in original hands*, will be paid at their full nominal value, which would make the claim of the said Jesse Haldeman, deceased, amount to about twenty thousand dollars, instead of thirteen thousand, three hundred dollars, as at present scaled down. Therefore we, the said T. Jefferson Chambers, and the said David Haldeman, for himself as one of the legatees of the said Jesse Haldeman, deceased, and in behalf of the rest of the legatees, as their agent and attorney in fact, to wit: Thomas Haldeman and Sarah Ann, his wife, by virtue of a power dated the 26th day of October, A. D., 1851 ; for John A. Haldeman and Jane his wife, by virtue of a power of attorney, dated the 9th of September ; for Francis X. McAtee and Elizabeth his wife, by virtue of a power of attorney, dated the 10th of August, A. D., 1851, and for John R. Birch and Mary his wife, by virtue of a power of attorney dated the 18th of October, A. D., 1851, all of which powers are of record in said county of Bastrop, have agreed to revoke the said transaction had between us the said David Haldeman and the said T. Jefferson Chambers, on or about

the 4th day of March, A. D., 1853, with regard to the said sale and transfer of the said claim of the said Jesse Haldeman, deceased, against the late Republic now State of Texas, for the said tract of land known as the Tennell Bend; and we do hereby revoke, annul and cancel the said sale, transfer and assignment made by the said David Haldeman to the said T. Jefferson Chambers, of the said claim of the said Jesse Haldeman against the late Republic now State of Texas, amounting to thirteen thousand, three hundred dollars, at the scaled rate, and we do hereby consequently also revoke, annul and cancel the said agreement of the said T. Jefferson Chambers, in consideration of the said sale to him of the said claims, to sell to the said David Haldeman the said tract of land known as the Tennell Bend, and we do hereby release each other from the said agreement, sale, transfer and assignment; and we do hereby bind ourselves, our heirs and legal representatives, and all the parties concerned therein, as above set forth and specified, to abide by this equitable settlement and adjustment of the premises.

In testimony we have hereunto set our hands and seals, this 18th day of February, A. D., one thousand eight hundred and fifty-four, in the presence of the undersigned witnesses.

DAVID HALDEMAN, [SEAL.]<br>T. J. CHAMBERS, [SEAL.]

Attest :

JOHN H. COOK.

S. C. OLIVE.

Said act of rescission was recorded on the 20th of February, 1854. Defendant Chambers then read in evidence, without apparent objection, the answer of his co-defendant David Haldeman; said answer was sworn to.

Defendant then read in evidence the deposition of Warren Larkins, taken by consent, as follows:

On the 5th day of March, 1853, T. J. Chambers and David Haldeman, the defendants, appeared before me and informed

Haldeman v. Chambers.

me that they had agreed to make a trade in reference to a tract of land known as the Tennell Bend, and a certain claim which said Haldeman held against the Republic of Texas, in favor of his deceased brother Jesse Haldeman, for the sum of thirteen thousand and three hundred dollars, which he proposed to transfer and assign to said Chambers for the said land. Said Chambers, at the time of the said transfer, told the said Haldeman that his reasons for making the said trade were, that he was in the immediate necessity of raising money to meet certain judgments and claims against himself, and that he well knew the land he was trading to said Haldeman was worth more than the sum to be obtained on the said certificate of Public Debt, and that his only object in making the trade was to obtain immediate funds to meet his own liabilities which were pressing, and bound to be met and arranged promptly, and that if any difficulty should be met with in procuring the said funds, in consequence of any defect in the said Haldeman's right and power to sell and transfer the said government claims, it would result in great damage to the said Chambers; and the said Haldeman represented that he had a full and complete right to sell and transfer the said government claims, and that it was understood between him and his brothers and sisters, and that he would make the transfers of said claims in favor of said Chambers, good and valid within sixty days after the trade. And said Chambers then executed and acknowledged before me as a Notary Public, an agreement to make a deed in favor of said Haldeman for the said tract of land, and the said Haldeman at the same time executed and acknowledged before me an assignment or transfer of said public debt claim, in favor of said Chambers, and agreed to make his right to the same complete and valid within sixty days. I do not recollect any other facts or circumstances which would affect the parties.

Defendant Chambers then proved by deposition of J. B. Shaw, Comptroller, that the insertion of said claim in class C.

was a mistake, except as to the amount of $1,800 ; read the report of Auditorial Board of December 27th, 1849, and the Veto Message of the Governor of 29th January, 1852, relating to the cases in class C. Defendant Chambers then read in evidence the powers of attorney under which David Haldeman acted in negotiating the sale of said certificate to him. There was a power from T. J. Haldeman to David Haldeman ; all the others were to T. J. Haldeman, jointly, or to either of them. The terms of authorization were as follows :

To institute and use all necessary means and proceedings whatsoever, for fully and finally receiving and settling for the legacy aforesaid, or so much thereof as we or either of us may or ought to have, and if it should be found necessary to borrow or advance money for paying the subscription debt charged upon said legacy, in order to recover and receive said legacy, we do authorize and empower our said attorney, or either of them, to borrow or advance upon the faith and pledge of our share of said legacy, our due proportion, (with which said legacy was chargeable under the will—REPS,) of said debt, and the same shall be chargeable upon and fully repaid out of our said share ; and we do fully authorize and empower our said attorneys, and either of them by himself, to ask, collect and receive from Campbell Taylor, or the representatives of said Jesse Haldeman, or any other person or persons holding or controlling in any way the said Texas debt, so bequeathed by Jesse Haldeman to his brothers and sisters, all our share, part, or interest of and in the same, and all certificates and evidences thereof or proceeds thereof, and for that purpose to make all orders, use and prosecute allways' means and suits and proceedings, execute, acknowledge and deliver in due form of law, all proper receipts, discharges, deeds or other writings, employ such counsel and. generally do and direct all other such acts, matters and things as in the discretion of our said attorneys, or either of them, shall be requisite or proper, fully and finally to collect and settle said legacy, with

the same power to all intents and purposes as though we were personally present and acting, hereby certifying and confirming whatever they or either of them shall do or direct by virtue hereof.

The powers of attorney were recorded in Bastrop county before the negotiation with Chambers.

---

Defendant Chambers then introduced two letters from John A. Haldeman to David Haldeman, as follows;

CONCORD, MORGAN COUNTY, ILLINOIS, }
*April 28th*, 1853. }

DEAR BROTHER DAVID : I gave a power of attorney to Jefferson or you in 1851, to attend to the interest left me by Jesse at his death. I suppose that you have been acting under that power of attorney in adjusting the interests of the legatees in the estate. A few days since I received a letter from brother Jefferson with a power of attorney for me to acknowledge, to him to receive whatever of the estate that may come to me, with which I have complied, and send it to Jefferson at New Orleans. Jefferson stated to me in his letter of the present month, that he would go directly to Bastrop to attend to the settlement of Jesse's bequest to the legatees living out of Texas. I wish you to entertain no hard feelings towards me for giving this second power of attorney. I have no doubt of your ability and willingness to do everything that is just and right in the case. I had some doubt of the propriety of executing a second power of attorney for the same thing. If the first one was a valid instrument, and you are acting under it, this second one which I have given to Jefferson, at his request, will not revoke the first, or invalidate anything you have done or may do in the case I trust. I shall be satisfied with whatever you may have done, or will do, relative to my interest in the said estate. I wish you to write to me soon. I am very anxious to hear from you and your family. I have engaged in the itinerancy of the Methodist Episcopal Church.

This is my second year.  *  *  *  Write to me immediately.
Yours very affectionately.

JOHN A. HALDEMAN.

CONCORD, MORGAN COUNTY, ILLINOIS,
*September 6th,* 1853.

DEAR BROTHER : I have just received a letter from Jefferson
stating that he had great difficulty in settling with you, rela-
tive to the bond bequeathed to us by brother Jesse. Jefferson
writes that he had bought your interest by sacrificing to you
$1744, exclusive of your part of the overplus of the bonds
above the amount of the lands which you bought of Col. T.
J. Chambers, and that he, Jefferson, made arrangements in
Texas for Col. Chambers to make a new deed for the land to
him (Jefferson.) He asks me in his letter if I am satisfied
with his transaction in the matter ; I will answer him that I
am not, with the light I have on the subject. I am not willing
to make such a sacrifice. I believe the power of attorney
under which you bought the land is valid, and whatever
private agreement made between you and Jefferson cannot
cancel the interest of any of the heirs in that land so purchased
by you. I think you had better forbid Col. Chambers making
a new deed to Jefferson. You have the right to control that,
and, by your power of attorney from the heirs, in favor of all
the heirs interested, you should have the deed made to all the
heirs conjointly, and by no means either to yourself or to
Jefferson. Your private contract with Jefferson, I think,
ought to be rescinded, and thereby avoid a difficulty. You
will please write to me immediately, and give me a full account
of this matter. I wish if possible to avoid any difficulty, but
I do not see the justice or right of your and Jefferson's manage-
ment of the estate for the balance of the heirs. Direct your
letter to me at Carlinville, Macarpin county, Illinois. It may
be best for all of us to meet together and settle the whole
affair amicably. Your explanation of the matter may change

my mind ; at present I view the matter as standing in this way, so far as Mary, Elizabeth and I are concerned. We have each paid $80 00 to get the bonds out of the administrator's hands ; each of us is to give our part of the overplus of the bonds above the land you bought, which is $436 00 according to your and Jefferson's arrangement, and agreeable to Jefferson's letter to me, Col. Chambers is to make him a deed to the 1112 acres. Now, it seems to me that so far we have gained nothing by our power of attorney to you or Jefferson, for we have each paid and given up by the transaction between you and Jefferson $516 00. The bonds had better remained in the hands of the administrator. Your contract with Col. Chambers, I understand, was that he would pay the balance or overplus of the bonds with oak lands at $2 50 per acre. Now it seems to me if you will carry out and confirm that original contract between you and Col. Chambers, only having the lands deeded to all the heirs jointly, that there will be no difficulty ; I think the rest of the heirs would be satisfied. It seems to me that the original power of attorney, under which you acted was valid, and that no power of attorney given to Jefferson since, can annul your acts under the first. I wish for us all to have the proceeds of the bonds according to the will of our deceased brother, and that we have no difficulty.

JOHN A. HALDEMAN.

Defendant Chambers then read in evidence a letter from T. J. Haldeman to J. H. Cook, as follows :

CINCINNATI, *Nov.* 20, 1853.

DEAR SIR : This morning I received your letter of 15th October which surprised me very much at the conduct of my brother. I went to Texas with powers of attorney from the heirs beside myself, to settle and arrange business with David who had acted in bad faith under powers of attorney which we all gave him some three years ago. While I was in Texas I had much trouble to get a settlement out of David, and

finally bought his interest in the Tennell Bend, for which I paid him, and took his deed which is recorded at Bastrop. Sherman Reynolds, James Nicholson and Campbell Taylor were agreed upon by us to arbitrate and settle matters between us, which David and I both consented to, and I refer you to those gentlemen about this matter.. After I left Texas, David gets Mr. Blanton to write to my two sisters in Kentucky and a brother in Illinois. The letters to my sisters have been forwarded to me for perusal, and a more infamous fabrication of falsehoods never was penned upon a piece of paper. David, no doubt, dictated to Mr. Blanton what to say, and had Mr. Blanton known the facts in this case, he never would have lent his aid in penning such falsehoods. I know not what my brother in Illinois has written David, or whether he has written him at all. I shall see my brother shortly, and let him know all about my settlement with David. I have written him, but he may not have received my letter. If he received such a letter from David as my sisters received, it was well calculated to poison his mind until he gets to understand the whole transaction. Mr. Hall I wrote to some two or three weeks ago, which letter he did not receive before you wrote; he can tell you something of this transaction, as he holds some money which I left with him to pay David for his interest, which was a mutual agreement between David and myself. I also paid out of the original amount that we agreed to leave with Mr. Hall some $130 or $140 to David for spending money in going down to Galveston. It is unnecessary for me to give you any further history of the difficulties between me and David. I am sorry to say that the conduct of my brother has been so faithless. I regret that Mr. Jones and Webb did not go on the land, and I hope they will still do so. David Haldeman has not a particle of right to interfere with you or any other person about the land, and I do not want you to surrender one particle of the power which I gave you to lease and take care of that land. I want

you to let no man attempt to dispossess you of the privileges which I gave you. Had Mr. Jones only gone to the clerk's office, and seen the deed which David gave to me for the purchase of his interest, he might have been satisfied that he would have been running no risk in going on the place; for David has no power to interfere with you. When David traded with Chambers for the land, Chambers gave him a bond for a deed, and at that time David should have taken a bond for a deed in the name of all the heirs, but he took it in his own name. David has instructed Chambers (in his deed to me) to make a deed for the land to me (Thomas J. Haldeman.) In order that you may see the power which I had to settle this business with David, I enclose you a copy, similar to each one that was given me by my sisters and brother. My sisters are satisfied with the arrangements I made, and I know my brother will be when he gets a correct history of the matter from me. I have purchased another interest from one of my sisters, so I now own three-fifths of the land, and one brother and one sister still retain their interest—one-fifth each. Please write me immediately, and let me know what David has been doing further in this matter.—Sincerely yours.

                              T. J. HALDEMAN.

P. S.—You can go to the clerk's office and see the deed recorded that David made to me, which I had done before I left Bastrop. The deed which David gave to me was written by Judge Oldham at Austin, which deed I gave to David when I parted with him at Galveston, so he might show it to Mr. Chambers, and when Mr. Chambers made a deed to me, then I told David to deliver my deed from him to C. K. Hall, so David now has my deed. Should he destroy it the original can be seen on file at the Clerk's office. I also gave him when we parted the three powers of attorney given me by my sisters and brother, similar to the copy I enclose you, but I have certified copies in case he should destroy them. I showed these original powers of attorney to Messrs. Reynolds, Taylor and

Nicholson when they were arbitrating this matter, as they wanted to see the power which I had to act in the settlement with David. I also instructed David to show these powers of attorney to Mr. Chambers, that Chambers might see my authority to act for all the heirs. When I separated with David he agreed to deliver the deed which he was to get from Chambers to me, and these three powers of attorney to C. K. Hall, and I wrote Mr. Hall to that effect from Galveston. You may, if you wish, show this letter to Mr. Hall, Reynolds, Taylor and Nicholson. I intend to write all these gentlemen soon, and I want you to write me soon without fail.

T. J. HALDEMAN.

Defendant Chambers then introduced John H. Cook, who testified :

That he was acquainted with the tract of land in controversy in this suit known as the Tennell Bend ; that he resides adjoining the same ; that it is worth fifteen thousand dollars ; that he knows of several opportunities which have offered for said Chambers to sell said land for that amount, but that said Chambers has been prevented from doing so by the claim set up by the Haldeman's to said land, and the institution of this suit ; that he knows of no person at present who would purchase said land at that price ; that said Chambers has never done any damage to said land, or carried any timber away from it; that the work which said Chambers has caused to be done on said land would tend to enhance the value of the same, instead of being a damage to it; that he has always considered said Chambers as being in possession of said land ; that said Chambers has constantly exercised ownership over it ; that when said Chambers heard that the Haldeman's were proposing to sell or dispose of it, he requested witness to warn purchasers not to buy from the Haldeman's, because they had not complied with their contract with him ; that T. J. Haldeman requested witness to take care of said land for

him, and to lease it out, but witness did not do so, as no person was found willing to have it under the circumstances.

The defendant Chambers then introduced Claiborne Harris as a witness, who testified that he was acquainted with the tract of land in controversy in this suit, known as the Tennell Bend ; that he was engaged in a negotiation with the said Chambers about the time of the institution of this suit ; that he was then willing to give said Chambers fifteen thousand dollars for said land, and that he was prevented from doing so by the suit and the claim to the land set up by the Haldeman's, and that he does not now wish to purchase it, having got another place.

The defendant then introduced Dr. Hogan as a witness, who testified that he was acquainted with the money market, and the value of money, for the last three years ; that the money market has been extremely stringent, and that money has been worth from twenty-five to thirty per cent. per annum, and that it has been sometimes worth as much as five per cent. per month.

It was admitted by the counsel for the plaintiffs, that David Haldeman had no power from his co-legatees to sell and transfer to the said T. J. Chambers the certificate of public debt, at the date of the transfer of the same by said David to said Chambers.

The Court gave judgment for the defendants, that the plaintiffs take nothing by their suit ; that the original contract be rescinded, the papers cancelled, and that the rights of all said parties to said certificates and said land be reinstated. It was further decreed that T. J. Haldeman be divested of one-fifth of the audited claim, and that said fifth be vested in David Haldeman ; and that defendants recover costs. The plaintiffs and defendant Chambers prosecuted writs of error.

*W. S. Oldham*, for T. J. Haldeman and others. I. If the

powers of attorney under which David Haldeman acted were originally insufficient to authorize him to sell and assign the certificate, yet his acts were ratified by his principals and were binding upon Chambers from the beginning.

In support of this proposition, I need but refer to the evidence. When Thomas J. Haldeman came to Texas in July, 1853, and learned that David Haldeman had sold the certificate, he did not question or repudiate the act, but received the benefit of the contract by purchasing the interest of David Haldeman. He was acting for himself and under full authority from the other parties in interest. After that act neither he nor the other plaintiffs could ever have repudiated the contract, but it became binding upon them to all intents and purposes. The following authorities are clear upon this point: (Story on Agency, Sections 417, 418, 419, 420, 239, 242, 244, 245, 248.) The bringing of this suit was a ratification of the contract. (Roe v. Pierce, 2 Camp. 96; Goodlitle v. Woodward, 3 Barn. & Ald. 689.)

II. I contend in the second place, that whether David Haldeman originally had authority to sell the certificate for the land or not, when he sold his interest in the land to Thomas J. Haldeman, he was divested of all control whatever over the subject, and his subsequent attempted rescission is of no more validity or effect than if entered into by any other stranger to the transaction.

If he had authority to make the sale, and purchase the land, that authority was extinguished by the performance of the act. (Story on Agency, Sec. 480.) The principals discharged or revoked his authority, by purchasing his interest and taking control of the land. (Story on Agency, Sec. 474, 475.)

But if he had no authority in the first instance, his acts became valid by being ratified, and then it is clear he had no authority to rescind the contract, after such ratification and knowledge on the part of Chambers of such ratification, as ad-

mitted in his answer  and  proven by Hall, whatever he might
have done before.

III.  Chambers had put it out of his  power  to  rescind the
contract, having drawn  drafts on Brower payable out of  the
proceeds  of  the certificate.  (2·Story's  Eq.  Jur. Sec. 1039,
1040, 1043 :  Mandeville v. Welch, 5 Wheatons, R. 277, 286 ;
Tiernan v. Jackson, 5 Pet. R. 597 to 601 ; Adams v. Claxton,
6 Vesey, 231 ; Ewing v. Arthur, 1 Humph. R. 541.)  And this
would be true whether Brower had accepted the drafts or not,
or consented to pay them from the proceeds.  (2 Story's  Eq.
Jur. Sec. 1044, 1047 ; Ex parte South, 3 Swanst. R. 393 ; Lett
v. Morris, 4 Sim. R. 607 ; Ex parte  Alderson, 1  Mad. 53 ;
Mandeville v. Welch, 5  Wheat.  277, 286 ;  Tiernan  v. Jack-
son, 5 Pet. R. 698 ;  Collyer  v. Fallon, 1  Turn. & Russ. 470,
475, 476 ;  Adams v. Claxton, 6 Vesey, 230 :  Row v. Dawson,
1 Ves. 331 ;  Priddy v. Rose,  3 Meriv. R. 86, 102 ;  Morton v.
Naylor, 1 Hill, N. Y. R. 583 ; Smith v. Everett, 4 Bro. Ch. R.
64 ;  Legard v. Hodges, 1  Vesey, 270 ;  Yates  v. Groves, 1
Vesey, 280 ;  Ewing v. Arthur, 1 Humph. R, 541.)

Had the plaintiffs brought suit against Brower for the certi-
ficate instead of against Chambers  for  the  land, they  would
most certainly have failed in their action.   Had they averred
a want of authority on the part of David Haldeman, he could
have answered the facts constituting a ratification of  his acts
as shown in this record ; and that  holding  the  certificate as
the property of Chambers, he had accepted drafts payable out
of the proceeds of the certificate, and  also held  it  bound for
the payment of the debt due him.

Were the  plaintiffs  to contend that the contract had been
rescinded, he could answer that it was not done until after the
acceptance of the drafts by him, and that such rescission if en-
forced would amount to a fraud upon him and the creditors in
whose favor he had accepted.

Were this judgment to be affirmed and we were to show that
the certificate had been adjudged to us, he could reply that he

and the creditors were not parties to this cause, nor bound by the judgment rendered in it. Thus it is clear that the certificate is chargeable with the payment of Chambers' drafts drawn against it, and yet the District Court decreed that he should not convey the land agreed to be given for it.

IV. But admitting that David Haldeman was fully authorized to rescind the contract, that rescission could not be sustained, because Gen. Chambers did not inform him, that he had drawn drafts against it in the hands of Brower.

This fact is established by the evidence of Chambers drawn out by himself from Brower. Brower's deposition furnished the first intimation that Chambers had no power to rescind the contract, for he could not return the certificate. Had the plaintiffs in ignorance of the facts ratified the act of rescission, I conceive they could have the deed of rescission set aside and enforce the original contract.

V. It was an error in the District Court to decree that the contract be rescinded, without ordering the certificate to be returned to the plaintiffs. The parties should have been placed in *statu quo.*

VI. The decree is equally erroneous and for the same reason, in favor of David Haldeman for one-fifth interest in the certificate, in the face of his deed in evidence acknowledging the payment of thirty-nine hundred dollars for his interest in the land, and without requiring him to repay to Thos. J. Haldeman the money so received by him. (2 Story's Eq. Jur. Sec. 696, 707.)

*J. W. Harris,* for Chambers. I. In reply to the first position taken by the counsel for the plaintiffs in the District Court, we say, first, that it will be seen by an inspection of the powers of attorney under which he acted, he had no power whatever to sell or assign the certificate.

2d. That it was admitted he had no such power.

3d. That if his said acts had been ratified by his principals,

this should have been alleged in the pleadings and should have been proven at the trial. There is no allegation of such ratification in the pleadings of the plaintiffs.

Again there is no evidence showing that his acts were ever ratified by his principals. There is no evidence that the plaintiffs ever conferred on Chambers any power to use, transfer or hypothecate the certificate, nor that they ever at any time, tendered such ratification.

In order to ratify the unauthorized act of David Haldeman, the principals must have done so in the manner prescribed by the Statute for the assignment of the certificate, and an instrument so authenticated should have been duly delivered or at least tendered to said Chambers the assignee. Since the plaintiffs have sued for a specific performance of the original contract, and have admitted that their agent had no power to make it, and have failed to allege or prove that it was ever subsequently ratified by them, we submit that this first position of their counsel is fully replied to, and we further submit that the record shows they have no cause of action whatever.

II. The second position taken by the counsel for the plaintiffs may be said to be almost entirely answered by what has been said in reply to his first position. But we may here add, that when T. J. Haldeman purchased the interest of David Haldeman in the title bond of Chambers, he well knew that David had no power to transfer the certificate, and that the bond was consequently based upon no consideration. If the original contract between David Haldeman and Chambers was not binding upon the latter it certainly could not become so by any subsequent contract between David Haldeman and Thomas J. Haldeman to which Chambers was no party ; nor is it easy to perceive how this transaction could contract or enlarge or in any way affect the powers under which David Haldeman had in the first instance acted. And we contend that an agent who is duly authorized to make a contract, and who has acted within the scope of his authority, could, with

the assent of the opposite party annul such contract at any time before it had been reported to and had received the sanction of his principal; and surely an agent who had transcended his powers, and was alone responsible, could with the assent of the opposite party cancel the contract.

III. The third position taken by the counsel for the plaintiffs is that " Chambers had put it out of his power to rescind " the contract, having drawn drafts thereon payable out of " the proceeds of the certificate." In reply, we say the pleadings have made no such issue in this case. The plaintiff has not in his petition or his amended petition, stated that any such drafts had ever been drawn. Had such issue been made by the pleadings, the defendant Chambers might have been able to prove at the trial, that the drafts had been drawn upon the condition that they were to be paid out of the proceeds of the certificate, in the event the assignment might be perfected, or in the event that the certificate could within a specified time, be sold or pledged ; or he might have been able to prove, that though such drafts had been drawn, they had been subsequently paid.

It does not appear that Brower, who may be said to be the agent for the drawees, objects to a rescission of the contract either on his own account or on theirs.

Besides in answer to the third interrogatory propounded by the plaintiffs, the evidence of Mr. Brower shows that the certificate is unincumbered by the drafts.

IV. The fourth position taken by the counsel for the plaintiffs, is, the rescission would not be valid because Chambers did not inform David Haldeman that he, Chambers, had drawn drafts against the certificate in the hands of Brower. In reply we say, that the plaintiffs have in their pleadings, made no such issue ; they have nowhere alleged that such drafts had been drawn against the certificate ; nor have they alleged that Chambers was guilty of any concealment whatever in relation to the drafts. Had such allegations been made we

might have been able to prove that Chambers had at the time of the rescission, communicated every fact in relation to the drafts ; that if such existed, he promised to pay them without delay, and that they accordingly had been paid.

V. The fifth position taken by the counsel for the plaintiffs is, that the Court erred in decreeing a rescission of the contract, without ordering that the certificate be returned to the plaintiffs; for he says " the parties should have been placed " in *statu quo*." In reply we say, the Court committed no error in this particular ; that the parties were in *statu quo*, for the certificate was left in the hands of John H. Brower, where the agent of the plaintiffs had previously placed it. We may further remark that T. J. Haldeman had put it out of the power of Chambers to return the certificate, by notifying Brower not to deliver it to Chambers.

VI. It is shown by the evidence of Larkins, that time was the essence of the contract, and as the plaintiffs and their agents failed to comply with its stipulations, the Court, we submit, would not under any circumstances decree a specific performance in favor of the defaulting and against the injured party. (See Edwards v. Atkinson, 14 Tex. R. 373.)

The evidence of M. M. Potter, which has been relied on by the plaintiffs, would, we contend, be insufficient to show that the contract of David Haldeman had ever been ratified by his principals, or that it had ever been complied with, either by the agent or his principals. We further contend that the evidence fails to show that in this case (where time was the essence of the contract) a specific performance should be decreed in favor of the parties who were never bound by the contract, and against the party who was injured by the failure of their agent to carry out the contract. But the counsel for the plaintiffs contends that the contract on the part of David Haldeman was fully complied with by the mere delivery of the certificate within sixty days from the time at which the original contract was made. In reply we say, the contracts are to

be construed according to the intent of the contracting par-
ties.    Now the record shows that Chambers contracted to sell
this bond at some thousands of dollars less than its real value,
in order to raise funds to pay judgments, and it was all import-
ant that he should have the benefits of the certificate within
sixty days, and this was known to David Haldeman.   Under
such circumstances who can believe that either of the contract-
ing parties supposed that Chambers was making such a sacri-
fice, to purchase a certificate, four-fifths of which would be
worthless in his hands ?   Such a construction would surely be
far from according with the intent of the parties to this con-
tract.

*A. J. Hamilton,* for David Haldeman.


WHEELER, J.   The proof shows very satisfactorily that the
defendant Chambers had a special object in view in making
the contract, by which he obligated himself to make title to
the land, in consideration of the assignment to him of the
audited certificate of public debt.   It was that he might sell
or hypothecate the certificate for a loan of money to meet his
present, urgent necessities.   And this was well known to the
other contracting party, who acted, in making the contract,
for himself, and as agent for these plaintiffs.   The latter un-
dertook and guaranteed that he had full power and authority
from the plaintiffs to assign and transfer the certificate by his
deed of assignment of the 4th of March, 1853. The obligation
to make title, on which this suit is brought, states the fact of
the assignment and guaranty of authority to assign, and ex-
presses that it is given in consideration thereof, and of the
" engagement of the said David Haldeman to cause the said
" certificate to be delivered to me within sixty days, and the
" full amount of any loan which may have been negotiated
" thereon." The certificate had been sent to Brower & Co., of

New York, to negotiate a loan of money. The manifest intention of the parties was, to pass the property in the certificate, by the assignment, so as to enable the assignee, Chambers, to use it, and its proceeds, as his own ; and if the assignment was not effectual for that purpose, to make it so within sixty days, from that date. No other delivery of the certificate by Haldeman was necessary, or contemplated, than such as would be effected by the assignment and power to demand and receive it, and any loan which might be negotiated upon it, from the hands of Brower & Co., if the power under which Haldeman acted, was sufficient to enable him to make the assignment, and empower the assignee to demand and receive the certificate. If these were sufficient, nothing more was required of him. If not sufficient, his undertaking bound him to make it sufficient within sixty days. This is the only sensible construction which can be put upon the terms of the contract ; and it accords with the testimony of the witness Larkins, as to the actual understanding of the parties. The limit of sixty days could not have reference to the assignment, which was made at the time. It had not reference to the mere manual tradition of the certificate ; for that, without the ability to use it, would have been of no avail to the defendant ; besides, that was to be effected by the power accompanying and coupled with the assignment. It had reference to the perfecting of the assignment and transfer within that period (in case it needed anything to perfect it), so as to render the certificate available to the defendant, for the purpose for which he had purchased it. It can have had reference to nothing else. This, then, was the undertaking of David Haldeman, for himself, and as agent for the plaintiffs. But there was an utter failure on the part of the plaintiffs and their agent, to comply with their undertaking. The agent had no power to make the necessary assignment ; and the principals did not make it. The former could not, and the latter have not performed that undertaking. The defendant was delayed,

and finally defeated, in accomplishing the object he had in view, in making the purchase, without any fault of his own, but by the fault of the plaintiffs, or their agent ; and it is immaterial which, the consequences to him were the same, and so are they upon the right of the plaintiffs, to have a specific performance of the contract. Surely it cannot be supposed that the plaintiffs are in a condition to claim the specific performance of the contract by the defendant, when they have wholly failed to perform on their part; or, that any transactions between themselves and their agent, as to the purchasing of his interest in the contract, can give them that right.

It is said the plaintiffs ratified the contract made by their agent. But that was not enough. They were bound, not merely to ratify, but to perform the contract. If they adopted the contract of their agent, they took it with all its obligations and consequences ; and were obliged to perform its stipulations. If they ratified the act of sale, it became their contract, and they were bound to its performance, in like manner as if they had personally made it. (Story on Agency, Sec. 250, 419 ; Story on Con. Sec. 164 ; Henderson v. The San Antonio and Mexican Gulf R. R. Co., 17 Tex. R. 560.) Their ratification of the acts of their agent can be of no avail to the plaintiffs in this action ; because they did not perform the undertaking with the defendant, to the performance of which, their agent, by his contract, had bound them.

It is immaterial whether the agent had authority or power to rescind the contract or not. When the plaintiffs failed to perform it, and the defendant Chambers was thereby prevented from deriving the benefits it was intended to confer, he had the right to treat it as at an end ; and to have it rescinded, without the consent of the plaintiffs, or their agent. Instead of sixty days, for which they had contracted, he gave them nearly twelve months, within which to perform their undertaking ; and when they still failed to do so, undoubtedly he was entitled to a rescission of the contract.

It is objected that the defendant had put it out of his power to rescind the contract, because he had drawn drafts on Brower, the holder of the certificate, payable out of the proceeds of its sale. This, it is insisted, was an equitable assignment by Chambers of the certificate. If Chambers had been the owner of the certificate, or had been legally empowered to assign it, the argument would be entitled to much consideration, though it does not appear that the drafts were accepted by Brower. But the giving of the drafts manifestly did not have the effect to operate an assignment of the certificate, for the plain reason that Chambers had not the power to assign it. Neither he nor Brower possessed competent authority to assign it to effect that object, by any act or deed of theirs, either equitably or legally. The drafts, though they had been accepted, could not effect an assignment, which neither the drawer nor acceptor had power to make. Moreover, the deposition of Brower, shows that the certificate is in his hands subject to the event of this suit ; and that the title to it is not affected by any lien, or other incumbrance. Had the plaintiffs assented to the rescission of the contract, instead of bringing suit to enforce it, there is no reason to suppose that any one would or could have contested their title to the certificate. There would be more force in the argument for the appellants on this branch of the case, if they had charged the defendant with having converted the certificate to his own use, and had shown that he had it in his power to do so, in consequence of any act of theirs, done in fulfillment of their contract to convey it to him. But they have neither averred, nor offered to prove, a compliance with their contract to make good the transfer. They have not put it in the power of the defendant to use the certificate. On the contrary, the plaintiff Thomas J. Haldeman, before instituting suit, gave notice to Brower not to deliver the certificate to the defendant ; and then, while thus withholding, or causing to be withheld, the consideration moving to the defendant, he brings suit to com-

pel him to the performance of the contract. This plaintiff, it
seems, would have the certificate withheld from the defendant,
and deprive him of the opportunity of deriving any benefit
from the contract, while he shall make the experiment of a
suit to recover the land. There was no pretence to charge
the defendant, with seeking to hold on to both the land and
the certificate. For when he found it impossible to use the
certificate, after affording the plaintiffs ample time to furnish
him the means of doing so, as, by their contract, they were
bound to do, he relinquished all claim to the certificate. This
is evidenced by his rescission of the original contract long
before the institution of this suit. The plaintiffs do not aver
a performance of the contract, on their part, according to its
true and obvious spirit and intention ; and while failing to
perform, and withholding the consideration, they seek to com-
pel a specific performance by the defendant. The attitude
which they occupy upon the record, certainly does not seem
to commend their case to the favorable consideration of a
court of equity ; which holds it a first principle and maxim,
in administering relief, that he who seeks equity, must do
equity.

It is objected to the judgment that it does not order the
certificate to be returned to the plaintiffs. That was unneces-
sary. It was placed in the hands of Brower by the plaintiffs,
or their agent. After being advised of the assignment to
Chambers, Brower considered that he held it for him, until,
on attempting to negotiate a loan upon it, the authority of
the agent to make the assignment was questioned. He now
holds it subject to the event of this suit. The right to it has
been adjudged to the plaintiffs, and that is sufficient to enable
them to' demand and receive it. There is no error in the
judgment, in favor of the defendant Chambers.

Upon the question, whether there was error committed
against him, in declining to award damages in his favor ;
without deeming it necessary to determine whether the case

Haldeman v. Chambers.

presented by his answer was such as would entitle him to maintain an action for damages, we are of opinion that the Court did not err in declining the award. It may be a question, whether, in consenting to waive a jury, the defendant is not to be deemed to have waived his right to claim a judgment for unliquidated damages. Such damages are the proper subject of assessment by a jury. It is within their peculiar province to assess damages in such cases. If in any case, the Court can be required to assess damages of this nature, it can only be where the evidence is so certain, as to the amount of damages sustained, that it may be estimated by computation or calculation merely. The evidence in this case is not so certain ; and we are of opinion that the Court did not err in the matter assigned as error by the defendant. As between the plaintiffs and the defendant Chambers, therefore, there is no error in the judgment.

In so far as the decree divests an interest of one-fifth in the audited certificate, out of Thomas J., and vests it in David Halderman, it does appear to be erroneous. The deed from the defendant David, to the plaintiff Thomas J. Halderman, of the 12th of July, 1853, by which the former conveyed to the latter his interest in the land, then supposed to have been obtained in consideration of the certificate, recites the receipt, by the former, of the latter, of three thousand nine hundred and five dollars. This recital must be deemed *prima facie* evidence that that sum was paid. This presumption is not repelled by the evidence, unless it be in part by another recital in the deed ; and that does not account for but a portion of the consideration expressed to have been received. Until the recital is disproved, or the money admitted to have been received is fully accounted for by this defendant, he is not entitled to be reinstated in his interest in the certificate. The judgment in favor of the defendant Haldeman must therefore be reversed ; and we might proceed

to give judgment upon the case as presented by the record. But as there is reason to believe the justice of the case, as between the plaintiffs and this defendant, will be more certainly ascertained by remanding it for a new trial, when the investigation of their respective rights will be disembarrassed of the litigation with the other defendant, it will be remanded for a new trial between the plaintiffs and the defendant Haldeman ; and the judgment affirmed in favor of the defendant Chambers.

Ordered accordingly.

*W. S. Oldham*, for T. J. Haldeman and others, filed an argument for a rehearing, in which he endeavored to show that the Court had placed a wrong construction on the stipulation for the delivery of the certificate, inasmuch as it appeared from the terms of the assignment to Chambers, and of the deed of revocation, and other circumstances, that it was not doubted at the time of the assignment, that David Haldeman's authority from the heirs was sufficient ; but that the stipulation was intended to provide against subsequent obstacles ; that no subsequent obstacles intervened ; and that the ratification of the act of their agent by the principals, was all that was required to enable them to maintain this action ; and that if the assignment was not such as to enable Chambers to assign or collect the claim, he should have applied to the plaintiffs for a sufficient assignment, which he could have enforced by suit, if necessary.

*T. J. Chambers*, for himself, also filed an argument for a rehearing on his claim in reconvention for damages, in which he endeavored to show, by reason and authority, that he was entitled to damages, if not to more, at least to nominal dam-

ages, for the failure of the plaintiffs and David Haldeman to perform their contract in the first instance, and the subsequent efforts of the plaintiffs to obtain the land, while they continued to hold on to the certificate ; whereby this defendant was harassed, injured in reputation and property, and defeated in his honest efforts for the payment of his just debts.


WHEELER, J. The appellants having asked a rehearing, and both parties desiring a reconsideration of the case, supporting their respective views by an elaborate written argument, we have given the case an attentive re-examination, in reference to the arguments submitted upon this application. Although it has not been the invariable practice of the Court to deliver opinions upon applications for rehearing where they have been refused, it is deemed proper, in view of the argument upon this application, to indicate the reasons why we adhere to the conclusion formerly arrived at on both branches of the case.

The literal sense of the words used in the obligation of Chambers for title, which the plaintiffs are seeking to enforce, standing alone, disconnected from other parts of the contract, may appear to be that placed upon them by the appellants' counsel. But they are not to be thus viewed. They are to be considered in connexion with other parts of the contract. All the stipulations which go to constitute the entire substance of the contract between the parties, are to be taken, considered and construed together, so that every part may be interpreted by the whole. And the writing is to be read by the light of the surrounding circumstances, in order more perfectly to understand the intent and meaning of the parties (1 Greenl. Ev. Sec. 277.) So read, it is clear that the mere delivery of the certificate was not all that was in the contemplation of the parties. Haldeman had undertaken to assign and transfer to Chambers the certificate, assuming to have full power and

authority from the plaintiffs thus to sell and dispose of it, and pass to the assignee their right and title ; coupled with a power to demand and receive of Brower (in whose hands it had been placed,) the certificate and any loan which might have been negotiated upon it. If Haldeman had the authority which he assumed to have, nothing more was necessary to give Chambers the control and use of the certificate. If there had been no doubt or apprehension respecting the sufficiency of his power, his undertaking to deliver the certificate, etc., within sixty days, would be unmeaning. Chambers, it seems, did not propose to withdraw the certificate from the hands of Brower. But he did not rely solely on the evidences he had, or the professions of Haldeman that he had authority to make the transfer ; he had not, it seems, perfect confidence that the assignment and power he had obtained, would give him the control and use of the certificate ; he required a " warranty, and the engagement of the said David Haldeman to cause the said certificate to be delivered to me (Chambers) within sixty days," together with any loan, etc. Haldeman was " to cause the said certificate to be delivered ;" how ? why, certainly, by making good the transfer of title, if that should be found not to be effectual for that purpose. How else could he cause it to be delivered, within sixty days, than by perfecting the transfer within that time, so that Chambers might lawfully demand, and Brower safely deliver the certificate ? This was the only way in which he could cause the certificate to be delivered to Chambers. It was not to be expected that Brower would respect the claim of Chambers, or deliver the certificate unless he had evidence that the right to it had been legally assigned and transferred to him. It was only by the furnishing of such evidence, that Haldeman could fullfil his engagement to cause the certificate to be delivered ; and this he was to do within sixty days. By the delivery of the certificate and any loan, etc., the parties evidently intended the delivery of it to Chambers in his own

right, and to his use ; not as a mere trustee or bailee of the plaintiffs. It was to constitute him the legal and equitable owner and holder of the certificate. That was the contract ; it was the purpose and object of the transfer, and what it proposed to accomplish. Unquestionably the certificate was to be delivered by virtue of the assignment, and in no other way ; that was to effect the delivery ; nothing else could. Any other supposition would do violence to the plain sense and meaning of the contract. It was to be a delivery which would answer the purposes contemplated by the contracting parties. It was doubtless supposed the assignment already made might be good and effectual to pass the title. But if not, undoubtedly the parties contemplated that it should be made so. Otherwise it would not answer the purpose intended ; and there is nothing else to which the limit of sixty days, within which Haldeman was to cause the certificate to be delivered, can reasonably be referred, than the perfecting of the transfers, if they should be found to need perfecting, in order to make them operative and effectual to pass the certificate ; in other words, to cause it to be delivered to Chambers the assignee. It is evident that the proposed delivery of the certificate was the last act which the parties contemplated should be performed by Haldeman. But unless it was accompanied by an assignment which would pass the title and enable the assignee to use it, it cannot be supposed that he would be obliged to receive it. Surely it cannot be contended that he was obliged to take it at all events, though it were utterly worthless in his hands, and go on to complete his part of the contract by making title to the land. Nor would there be more reason to require him to go about procuring the making of the necessary assignment. That was no part of his contract. It is said the certificate was delivered, because Brower recognized the right of Chambers. It is true that he did so, until, upon examination, it was discovered that he had acquired no right by the assignment. When that discovery was

　SUPREME COURT.

made, Chambers had the right to consider the contract as no longer binding upon him; though he had even had possession of the certificate, upon the discovery of his want of title, he might at once have returned it, and treated the contract as at an end. He was under no obligation to apply to the plaintiffs to make him a title. If they wished to hold him to his undertaking, it became them to see to it, that there was no default or failure on their part.

The conclusion that the contract bound the plaintiffs to make good the transfer of the certificate within the time specified, seemed so obviously to result from the terms of the contract and the manifest intention of the contracting parties, that we unhesitatingly adopted that as its evident meaning and intention. We cannot doubt that such was its intention; that such is the legal import of the terms which the parties have employed to evidence their intention. The delivery of the certificate, with the transfer of the right of property, necessarily included the assignment of it; causing it to be delivered to the assignee, comprehended the doing of whatever was necessary to pass and vest in him the title; consequently it required the making of such an assignment as would have the legal effect to pass the title, and constitute him the legal and equitable holder and owner of the certificate. The contract speaks for itself, and there is no mistaking its meaning. And although we may not look to evidence outside of it, to ascertain the meaning of the language employed, or to interpret the writing; yet we may do so to see if our construction of the contract accords with what is shown to have been the actual understanding of the parties, as shown by other evidence admitted without objection, and by consent; and we find that it does. It is fully confirmed by the testimony of the witness Larkin, and the answer under oath of the defendant David Halderman; who certainly knew what the intention really was, and whose answer was admitted in evidence without objection. We do not attach any legal effect to this evi-

dence ; but refer to it as showing that the intention and understanding of the parties really was what the contract itself imports. We might fortify our conclusion, by a reference to other matters in the record, but it is unnecessary.

But if it be admitted that we were mistaken, and the position of the appellants' counsel be correct, that the contract was made in the full belief and confidence on the part of both Chambers and David Haldeman, that the latter had full and ample power and authority to sell and transfer the certificate, as he assumed to do, and that they did not have in contemplation the possible contingency that something more might be necessary to complete the transfer and make it effectual, and consequently did not intend to stipulate for anything further to be done for that purpose, but only for the manual tradition of the certificate ; and that Chambers was not informed of the want of authority in David Haldeman until apprised of it by the letter of Brower of the 1st of August—what was then the state of case between the parties, and what the rights of Chambers ? Undoubtedly there was no subsisting contract of any binding force or obligation whatever ; Chambers had been deceived and imposed upon, by the profession and assumption of an authority by David Haldeman, which he did not possess ; and had the right to treat the contract as at an end, or as though it had never been made, and had no existence in fact ; or he had a right to claim its rescission, either instantly, upon the discovery of the deception under which he had acted ; or to give time to the plaintiffs to make good the act and contract of their agent, by completing the transfer, which he had assumed to make without their authority ; and in case of their failure to do so, then to claim a rescission of the contract. He, it seems, pursued the latter course ; and when they failed to make good the assignment, he claimed a rescission of the contract ; which he had a right to do, irrespective of any transactions or dealings between the plaintiffs and their agent. It is immaterial that Haldeman may have

acted in ignorance of his want of authority. The effect upon Chambers was the same as if he had made an intentional misrepresentation. The want of authority operated a surprise and imposition upon Chambers, which entitled him to a rescission of the contract, equally as if the deception had been intentional on the part of Haldeman. For "even if a party innocently misrepresents a material fact, by mistake, it is equally conclusive, for it operates as a surprise and imposition upon the other party." (1 Story Eq. Sec. 193 ; Henderson v. The San Antonio and Mexican Gulf R. R. Co., 17 Tex. R. 560 ; Wintz v. Morrison, Id. 372.) If therefore, as the argument assumes, the parties "entered into the contract under the erroneous supposition that David Haldeman had authority to sell and transfer the certificate," the contract was void for the want of mutuality, and because of the manifest surprise, deception and imposition which it operated upon the other contracting party. This, it is conceived, is quite too clear for doubt or controversy. And whether we were right or not, in our construction of the contract, the conclusion must be the same. It cannot be denied or doubted that it was the intention of the contract to constitute Chambers the legal and equitable holder of the certificate, by virtue of a legal and valid assignment. No such assignment was made by the plaintiffs ; and nothing can be more perfectly clear, than that they have not placed themselves in a condition to demand of him a specific performance of his undertaking to make title to the land.

Again, the instruction of Thomas J. Haldeman to Brower, before instituting suit, not to deliver the certificate to Chambers, or to his order, is, without more, an answer to this suit for specific performance, so far as he is concerned. His avowed object was to have his recourse upon the certificate, in case he failed in his suit for the land. But he cannot have a decree for specific performance against Chambers for the land, while he thus withholds from him the consideration in-

Haldeman v. Chambers.

tended to be given for it. A court of equity cannot indulge a party in thus experimenting upon his rights. If he elected to go for the land, he must have given up the certificate. The conveyance of the land was not a condition precedent to the transfer of the certificate : if it had been so intended, it would have assumed the form of a deed instead of a bond for title. But the latter form of instrument was adopted, doubtless, for the reason, that it was the understanding of the parties, that the title to the land should not be made, until the assignment of the certificate was complete and effectual. The instructions, therefore, to Brower, were incompatible with the suit for specific performance.

It remains to consider the question upon the other branch of the case—the claim of the defendant for damages. As the case was submitted to the Court, waiving a jury, it results, that if the Court erred in declining the award of damages, it would devolve upon this Court to assess the damages which the Court below ought to have assessed ; unless we were to assume the very questionable power of remanding the case for a trial by jury, when the parties waived that right upon the trial below. We were inclined to the opinion, that, as the suit was for a specific performance, and that was the matter principally litigated, the submission of the case to the decision of the Court, waiving a jury, under the circumstances, might be deemed a waiver of the claim for damages ; and we disposed of the question upon the ground that the Court was not bound to assess unliquidated and uncertain damages. The better opinion, perhaps, is, that the Court is not bound to receive the submission of such a question without a jury ; but if the Judge see proper to receive the submission, the Court will assess the damages. It is material then to decide whether the defendant was entitled to an award of damages.

We think it clear that he could not found a claim for damages upon the contract for the breach of it, after his agreement to rescind and actual rescission of it. By his voluntary rescission of the contract he waived any right he may have

had to sue upon the contract. He could not maintain an action for damages for the breach of a contract, by which he chose not to abide, and which he elected to treat as no contract. The rescission of the contract went upon the ground that it was not the act of the plaintiffs, and was not binding upon the defendant ; that not having given authority to make it, the plaintiffs were not bound by it ; it was not their act, and consequently they were not bound, nor entitled to hold the defendant bound by it ; and of consequence, they could not be held responsible for its breach, nor for any of the consequences growing out of the breach of it. It is said, however, that by their acts they subsequently ratified the contract. But, I apprehend, if the defendant would have availed himself of their ratification of the contract, he must have consented to be bound by it. He, at least, must not have agreed to a rescission of it, the object of which was to place the parties in *statu quo.* The rescission of the contract by mutual consent, under the circumstances and in the terms in which it was effected, had the effect of a settlement and adjustment of the matters in question, as between this defendant and David Haldeman, and is an answer to any claim of damages against him upon the contract. If the defendant have any legal claim for damages against the plaintiffs, it is not upon the contract ; but is for the injury which has resulted from the putting of legal process in force against him, in the bringing of this suit, and for the slander of his title. But this, however it may have operated to the prejudice and injury of the defendant, does not, it is conceived, constitute an injury for which he can claim legal redress in damages under the circumstances of this case. Although it is a maxim of the law, that there is no wrong without a remedy, and it has been said, that " wherever the common law gives a right, or prohibits an injury, it also gives a remedy by action (3 Bl. Com. 123,) yet this is to be understood of legal right and injury, and not that legal relief is to be had for every species of loss or injury that individuals sustain by the acts of others. There

is a class of cases in which a damage is sustained by a party, but a damage not occasioned by anything which the law esteems an injury. This kind of damage is termed in law *damnum absque injuria,* and for it no action can be maintained. Thus, "where process is served by mistake on a wrong person, and all the proceedings in the action are taken against him, the defendant so wrongfully sued, will undoubtedly have a good defence to the action, and will consequently recover his costs; but if it be asked what further remedy he has for the inconvenience and trouble he has been put to, the answer is, that, in point of law, if the proceedings have been adopted purely through mistake, though injury may have resulted to him, it is *damnum absque injuria,* and no action will lie. Indeed, every defendant against whom an action is unnecessarily brought, experiences some injury or inconvenience beyond what the costs will compensate him for." (Brown's Leg. Max. 151, 152; Sedgw. 30, 31, n.) If the defendant had sold his land on credit of sixty days, instead of for the certificate of public debt, and had taken the most solemn guarantees of prompt payment, and the purchaser had, nevertheless, refused payment, the injury might possibly have been as great as it has been, and yet, it will not be contended, that his measure of redress would not be confined to the recovery of the debt with interest. That might be very inadequate redress for the injury really sustained by the breach of promise and good faith on the part of the purchaser; but the law recognizes no claim for damages, in such a case, beyond legal interest. Every one is liable to be harassed and injured in his property and feelings by unfounded suits to recover of him property which is his own, but this is not an injury for which he can have legal redress. To give a right to such redress, there must not only be a loss, but it must have been injuriously brought about by the violation of some legal right. And no one can claim a legal exemption from suit, by another who fancies he has a cause of action against him, however unfounded the claim may be in justice or law. An action on

the case, it is said, lies in certain cases, for special damage occasioned to the person or property of another by maliciously, and without probable cause, instituting a civil suit. " There are no cases in the old books" (said Lord Camden, in Goslin v. Wilcock, 2 Wilson, 302, 305,) " of actions for suing where the plaintiff had no cause of action ; but of late years, when a man is maliciously held to bail where nothing is owing, or when he is maliciously arrested, for a great deal more than is due, this action has been held to lie, because the costs in the cause are not a sufficient satisfaction for imprisoning a man unjustly, and putting him to the difficulty of getting bail for a larger sum than is due." And it is said to be now well settled that arresting and imprisoning, or holding to bail, where nothing is due, or for more than is due, if done maliciously and without probable cause is actionable. (1 Am. L. Cases, 218.) But these actions are said to stand on the same legal footing as actions for malicious prosecution. (Id. 219.) The gist of the action is the putting of legal process in force, regularly, for the mere purpose of vexation, annoyance or injury ; and the want of probable cause, and malice are essential to maintain the action. The question of probable cause does not turn upon the innocence or guilt of the accused, but upon the prosecutor's belief of it at the time, upon reasonable grounds. If the party lays all the facts of the case fairly before legal counsel before beginning proceedings, and acts *bona fide* upon the opinion given by counsel, however erroneous the opinion may be, he is not liable to this action. (Id. 221, 223 ; 9 Tex. R. 603.) It is clear that, upon the principles on which these actions rest, the claim for damages in this case cannot be maintained. The plaintiff, Thomas J. Haldeman, who brought the suit, acted upon the advice of legal counsel. That he believed he could succeed in his action and recover the land is beyond a question. He did not sue for the mere purpose of annoying or injuring the defendant, but for the purpose of recovering the land ; and he doubtless be-

lieved he was but asserting a legal right. For such assertion of right, however injurious to the defendant, he is not liable in damages. The evidence does not show that the defendant sustained any injury in consequence of the sueing out of the sequestration, or that he was subjected to any inconvenience in giving the required bond and security. The injury appears to have resulted from the bringing of the suit, and not from the wrongful sueing of the writ.

It is very questionable whether an action will lie in any case, for the injury done the plaintiff by slandering and bringing into doubt and distrust his title, by one who claims title in himself, and brings suit for the recovery of the property. In Kendall v. Stone (2 Sanf. Sup. Ct. R. 269,) the Court waived the decision of the question. But they cited from Cook's Law of Defamation (p. 23,) where he says : "As soon " as it appears that the defendant claimed title to the prop- " erty, to which the slander applies, he is entitled to a non- " suit." And in Starkie on Slander (1 Stark. 193 n.) it is said, "But it is held that, to institute a civil suit, though there " be no good ground for it, is not actionable, because it is a " claim of right for which the plaintiff has found pledges, is " amerciable *pro falso clamore*, and is liable to costs ; and " therefore that no action lies, unless the defendant be mali- " ciously sued, with intent to imprison him for want of bail." It is clear that an action will not lie for the slander of title, where the party acted under the advice of legal counsel in bringing the suit ; and under the *bona fide* belief, founded on such advice, that he was entitled to recover. We conclude that the action for specific performance, and the claim in reconvention for damages, are equally without any solid foundation in law ; and that the judgment heretofore rendered remain the judgment of this Court.

Ordered accordingly.